PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

AMERICAN MORTGAGE NETWORK,
INCORPORATED,

*Plaintiff-Appellee,*

v.

MICHAEL D. SHELTON; PAMELA D.
SHELTON,

*Defendants-Appellants.*

No. 06-1576

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Carl Horn, III, Chief Magistrate Judge.
(3:05-cv-00083)

Argued: March 15, 2007

Decided: May 14, 2007

Before WILKINSON and MOTZ, Circuit Judges, and
Henry E. HUDSON, United States District Judge for the
Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Hudson wrote the opinion, in
which Judge Wilkinson and Judge Motz joined.

## COUNSEL

**ARGUED:** Brett E. Dressler, SELLERS, HINSHAW, AYERS,
DORTCH & LYONS, P.A., Charlotte, North Carolina, for Appel-
lants. Kenneth B. Oettinger, Jr., WOMBLE, CARLYLE, SAN-

DRIDGE & RICE, P.L.L.C., Charlotte, North Carolina, for Appellee.
**ON BRIEF:** Robert C. Dortch, SELLERS, HINSHAW, AYERS,
DORTCH & LYONS, P.A., Charlotte, North Carolina, for Appel-
lants.

---

**OPINION**

HUDSON, District Judge:

This declaratory judgment dispute presents a number of issues con-
cerning the procedural requirements associated with the right of
rescission under the Truth in Lending Act (TILA), 15 U.S.C. § 1601,
et seq. American Mortgage Network, Inc. ("Amnet") petitioned the
district court for a declaratory finding that its processing of appellants
Michael and Pamela Shelton's notice of cancellation of their home
refinancing loan was consistent with TILA. In addition to seeking
damages for TILA violations, the Sheltons counterclaimed for rescis-
sion and urged the district court to declare that Amnet's failure to
unconditionally release their security interest warranted forfeiture of
the loan principal under TILA. The district court disagreed and
awarded summary judgment for Amnet. Because we find that Amnet
complied with all applicable provisions of TILA, we affirm the judg-
ment of the district court.

Amnet is a residential mortgage lender that conducts business
throughout the United States. Amnet sells the loans it makes on the
secondary market to banks and institutional investors.

In December 2004, Michael D. Shelton ("Shelton"), a self-
employed real estate appraiser, borrowed approximately $317,000
from Amnet to refinance an existing note on his primary residence.
His wife, Pamela Shelton, was not a co-borrower and did not execute
any of the loan documents. However, she executed a Deed of Trust
in Amnet's favor to secure the loan. There is no dispute that Shelton
was provided with all required TILA disclosures and a HUD-1 state-
ment at the time of closing.

The record further revealed that, in July 2004, the Sheltons signed
a contract to purchase a custom-built home. In order to place him in

a more creditworthy position to finance his new home, the Sheltons sought to consolidate a number of debts including the preexisting loan secured by their residence. Their residence, located in Gastonia, North Carolina, had been purchased in March 2000 for $253,000.

The building permit for the Sheltons' custom-built home was issued on December 13, 2004. The Sheltons went to settlement on their new home on April 29, 2005, and moved in on May 1, 2005. It is undisputed that the debt service on both the mortgage secured by the custom home and the preexisting Amnet loan at issue in this case was beyond the financial means of the Sheltons. It is also clear that among the closing documents signed by Shelton in connection with the Amnet loan was an Occupancy Agreement in which he represented that he would occupy the house secured by that refinancing as his primary residence throughout the twelve-month period immediately following the loan closing.

Approximately one month after executing the closing documents on the refinancing in controversy, the Sheltons received a package of documents from Amnet. The cover letter accompanying the package stated that "the Truth-In-Lending Disclosure Statement was inadvertently under-disclosed in the amount of prepaid finance charges." (J.A. 14.) The letter further revealed that Shelton had been charged $100 more than the amount disclosed on the TILA form. The package did not contain a refund check for $100 as indicated. The package also included a single copy of a Notice of Right to Cancel, a copy of the same TILA financial disclosures given to Shelton at closing, and a copy of the Errors & Omissions Compliance Agreement that Shelton signed at closing. The Errors & Omissions Compliance Agreement required Shelton to execute a reformed loan document to cure the previous clerical error.

In support of his counterclaim alleging noncompliance with TILA, Shelton points out a number of perceived discrepancies in the Notice of Right to Cancel. Shelton believes that he was entitled to receive four copies of the notice document. The package apparently contained only one copy while the cover letter referenced three copies. Although Shelton was himself in the real estate business, he purported to find the Notice of Right to Cancel confusing because a removable sticker covered the line designated for signature to effectuate cancel-

lation. Lastly, Shelton did not believe that the $100 discrepancy was in fact a clerical error and questioned why the $100 check was not included in the package. Disturbed by these discrepancies, the Sheltons decided to cancel the transaction.

Amnet does not dispute that Shelton timely executed the cancellation documents indicating a desire to rescind the transaction. Three days later, on January 31, 2005, Shelton retained an attorney to represent him in connection with the loan rescission. In the interim, Amnet acknowledged receipt of Shelton's decision to rescind the loan transaction. Within 20 days of receipt of the notice of cancellation, Amnet confirmed that it was prepared to unwind the transaction in accordance with TILA, upon receipt of confirmation from Shelton that he was prepared to return the net loan proceeds, i.e., the original principal amount of the loan less all amounts charged to Shelton in connection with the transaction. The net loan proceeds totaled $313,468.39.

Amnet was subsequently advised by Shelton's attorney that his client was unable to return the net loan proceeds.[1] The Sheltons offered instead to sell the house to Amnet for the difference between an appraised value of the house, $370,000, and the net loan proceeds, $313,468.39. Amnet declined the offer and countered that it did not believe that the Sheltons' offer to sell their house to Amnet constituted a proper tender under TILA. Shelton's counsel replied that, in his opinion, Amnet was required under TILA to release its security interest on the house immediately without a specific agreement on the Sheltons' part to return the net loan proceeds. Amnet refused to release its security interest without any provision for repayment of the loan proceeds.

Shortly thereafter, the Sheltons retained new counsel, who notified Amnet by letter that Amnet had forfeited the loan proceeds by refusing to unconditionally release its security interest within 20 days of cancellation of the loan as required by TILA.

---

[1]Shelton admitted in his deposition that he did not disclose the existence of the Amnet loan when he applied for the loan on the custom home. *Am. Mortgage Network, Inc. v. Shelton*, No. 3:05CV83H, 2006 WL 909415, at *2 (W.D.N.C. Apr. 6, 2006).

Unable to consensually unwind the loan transaction, Amnet filed this lawsuit seeking modification of the TILA rescission procedures and an order declaring its full compliance with TILA. The Sheltons counterclaimed for declaratory relief and monetary damages.[2] During the course of the ensuing discovery, several facts emerged that were pertinent to the trial court's analysis.

First, it appeared to the trial court that Shelton significantly overstated his income in the initial loan application submitted on his behalf by Waterford Financial Services, Inc. ("Waterford Financial"). The application stated that Shelton's annual income in 2004 was $97,200. Subsequent examination of Shelton's 2004 tax return revealed an income of $34,236. According to Amnet, if Shelton's application had disclosed his actual 2004 net income, he would not have qualified for the loan.

Second, the Uniform Residential Appraisal Report received from Waterford Financial and purportedly prepared by an independent appraiser was in fact prepared by an appraiser operating under Shelton's supervision. Although the appraiser was technically an independent contractor, he had been trained by Shelton and worked exclusively for Shelton's company. The report estimated the fair market value of the house as of November 15, 2004, to be $370,000. Amnet contends that the appraisal was inflated and that a "truly independent" appraiser assessed its fair market value at closer to $300,000. Irrespective of the numbers, it appeared to be uncontroverted that the Sheltons' appraiser was not independent.

Third, despite signing an Occupancy Agreement at closing, representing that he intended to occupy the house as his primary residence throughout the twelve-month period immediately following the loan closing, Shelton was in fact in the process of building another home that would serve as his primary residence. The Sheltons could not afford to finance the custom home and continue payments on the Amnet loan.

---

[2]The Sheltons asked the trial court to cancel the Deed of Trust and allow them an indefinite period of time to sell the house to a buyer at a price of their choosing.

The Sheltons argue that the above-described alleged misrepresentations, which were found by the district court to constitute inequitable conduct, were material facts "hotly in dispute." The Sheltons maintain that the resolution of these factual disputes was critical to the issues of rescission and forfeiture. In their view, the trial court erred by refusing to conduct an evidentiary hearing to address these disputed facts. We disagree.

Despite the Sheltons' protestation, many of the facts underlying the inequitable conduct were uncontroverted. For example, Shelton's 2004 tax return reflected income far below that represented to Amnet. There is also no dispute that the appraiser who conducted the appraisal on the property was affiliated with Shelton and operated under his supervision. Although we do not believe that Shelton's inequitable conduct necessarily controlled the outcome of this case, it was appropriately considered by the trial judge.[3] As the United States Court of Appeals for the District of Columbia noted in *Brown v. National Permanent Federal Savings & Loan Ass'n*, 683 F.2d 444 (1982), "[a]lthough the right to rescind is [statutory], it remains an equitable doctrine subject to equitable considerations."[4] *Id.* at 447.

In this case, both parties seek equitable relief. The Sheltons elected to cancel the loan transaction and seek the release of Amnet's security interest in their property, pursuant to Title 15, United States Code, § 1635(b). This subsection of TILA reads as follows:

> When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law,

---

[3]The trial court characterized the Sheltons' misstatements as not only materially false, but sufficiently egregious to potentially warrant criminal prosecution. *See Am. Mortgage Network, Inc.*, 2006 WL 909415, at *2 n.3.

[4]In *Mars v. Spartanburg Chrysler Plymouth, Inc.*, 713 F.2d 65 (4th Cir. 1983), this Court held that the provisions of TILA must be "absolutely complied with and strictly enforced." *Id.* at 67. This was not to imply, however, that the Act's requirements should not be reasonably construed and equitably applied.

becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

15 U.S.C. § 1635(b).

The Sheltons construe § 1635(b) as requiring Amnet to unconditionally release the security interest on the Sheltons' residence within 20 days of notification of cancellation, regardless of the Sheltons' admitted inability to tender the balance due on the loan, or reasonable value thereof.[5] In fact, the Sheltons argue that the trial court erred in not declaring the loan balance forfeited by reason of Amnet's refusal to unconditionally remove the mortgage lien. In essence, the Sheltons claim the right to simply walk away with a windfall of $313,468 without any further obligation. This construction not only offends traditional notions of equity, but misinterprets the procedural requirements of § 1635(b).

---

[5]This Court does not believe that the Sheltons' offer to sell their residence to Amnet for an amount determined by a non-independent appraiser constituted "reasonable value." Amnet was not in the business of selling real estate.

In *Powers v. Sims & Levin*, 542 F.2d 1216 (4th Cir. 1976), this Court rejected the argument that § 1635 compelled a creditor to remove a mortgage lien in the absence of the debtor's tender of the loan proceeds. *Id.* at 1220. This Court held in *Powers* that, "when rescission is attempted under circumstances which would deprive the lender of its legal due, the attempted rescission will not be judicially enforced unless it is so conditioned that the lender will be assured of receiving its legal due." *Id.* at 1222.

We further noted in *Powers* that "Congress did not intend to require a lender to relinquish its security interest when it is now known that the borrowers did not intend and were not prepared to tender restitution of the funds expended by the lender in discharging the prior obligations of the borrowers." *Id.* at 1221.

The same rationale controls the case at hand. The trial court, in exercising its powers of equity, could have either denied rescission or based the unwinding of the transaction on the borrowers' reasonable tender of the loan proceeds. The equitable goal of rescission under TILA is to restore the parties to the "status quo ante." *See Yamamoto v. Bank of New York*, 329 F.3d 1167, 1172 (9th Cir. 2003); *Williams v. Homestake Mortgage Co.*, 968 F.2d 1137, 1140 (11th Cir. 1992). The Sheltons appear to misconstrue the procedural mechanics of § 1635. Clearly it was not the intent of Congress to reduce the mortgage company to an unsecured creditor or to simply permit the debtor to indefinitely extend the loan without interest.

This Court adopts the majority view of reviewing courts that unilateral notification of cancellation does not automatically void the loan contract. As the Ninth Circuit observed in *Yamamoto*, "[o]therwise, a borrower could get out from under a secured loan simply by claiming TILA violations, whether or not the lender had actually committed any." *Yamamoto*, 329 F.3d at 1172. "The natural reading of [§ 1635(b)] is that the security interest becomes void when the obligor exercises a right to rescind that is available in the particular case, either because the creditor acknowledges that the right of rescission is available, or because the appropriate decision maker has so determined. . . . Until such decision is made, the [borrowers] have only advanced a claim seeking rescission." *Large v. Conseco Fin. Servicing Corp.*, 292 F.3d 49, 54-55 (1st Cir. 2002). This Court declines to

adopt the reasoning of the Eleventh Circuit in *Williams v. Homestake Mortgage Co.*, espousing the minority position that rescission is automatic, but holding that the voiding of a security interest may be judicially conditioned on debtor's tender of amount due under the loan. *See Williams*, 968 F.2d at 1141-42.

Once the trial judge in this case determined that the Sheltons were unable to tender the loan proceeds, the remedy of unconditional rescission was inappropriate. Although the better practice may have been for the trial judge to set terms for rescission by allowing the Sheltons a time certain to tender the net loan proceeds, it was unnecessary under the facts of this case. Aside from the Sheltons' acknowledged inability to repay the loan, almost a year had passed from the date of exercising the cancellation of the loan. During that year, the Sheltons made no payments of principal or accrued interest on the loan. The trial court properly exercised its discretion in denying rescission.

Lastly, the Sheltons contend the trial court improperly granted summary judgment in finding that Amnet's Notice of Right to Cancel complied with TILA. The Sheltons maintain that there was a genuine issue as to whether Amnet provided "clear and conspicuous" notice of their right to rescind under TILA. They highlight a number of purported irregularities in the correction package sent by Amnet following notification that Amnet had inadvertently under-disclosed the amount of prepaid finance charges by $100.

Specifically, the Sheltons allege that pertinent portions of the Notice of Right to Cancel were obstructed by removable "Sign Here" stickers. They assert that the stickers obscured the cancellation signature blocks and the language indicating where to sign in order to rescind the transaction. It is, however, interesting to note that the Sheltons executed the cancellation documents almost immediately upon receipt and returned them to Amnet in a timely manner. The Sheltons also complain that they received only one copy of the new Notice of Right to Cancel as opposed to the four copies they argue are required by statute — two for each of the Sheltons. *See* 12 C.F.R. § 226.23(b) ("[A] creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind.")

Although this Court believes that Amnet substantially complied with all requirements of TILA in notifying the Sheltons of their right of rescission, this Court need not address each alleged hyper-technical violation. Here, Amnet had no obligation under TILA to provide a renewed notice of right of rescission or to reopen the cancellation period. This obligation is only triggered under TILA when the financial discrepancy is over $100. *See* 15 U.S.C. § 1605(f)(1)(A); 12 C.F.R. § 226.18(d)(1)(i). The notice provided to the Sheltons in this case was strictly voluntary and therefore needed not meet the technical requirements of 12 C.F.R. § 226.23(b).

In summary, we find that Amnet fully complied with all of the requirements of TILA in connection with this loan. The trial court properly denied rescission, given the appellants' inability to tender payment of the loan amount. For the foregoing reasons, we affirm the judgment of the trial court.

*AFFIRMED*