FILED
United States Court of Appeals
Tenth Circuit

July 30, 2012

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SCOTT SANDERS; LISA SANDERS,

      Plaintiff-Appellant,

v.

MOUNTAIN AMERICA FEDERAL
CREDIT UNION,

      Defendant-Appellee.

BRUCE ETHINGTON,

      Defendant.

No. 11-4008

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:10-CV-00183-DAK)**

---

Matt Wadsworth (Brian E. Arnold with him on the brief), of Arnold & Wadsworth, South Ogden, Utah, for Plaintiff – Appellant.

Joseph A. Skinner of Scalley Reading Bates Hansen & Rasmussen, P.C., Salt Lake City, Utah, for Defendant – Appellee.

---

Before **KELLY**, **McKAY**, and **O'BRIEN**, Circuit Judges.

---

**O'BRIEN**, Circuit Judge.

---

     For certain mortgage loans covered by the Truth-in-Lending Act (TILA), a timely

written notice of rescission triggers the creditor's duty to release its security interest and

refund any finance charges. Once the creditor satisfies this duty, the borrower must return the loan proceeds. Although we have not spoken authoritatively on the issue, several circuits allow district courts to equitably condition the creditor's duty on the borrower's ability to repay the loan proceeds.

In this case, however, the district court went further by concluding a borrower seeking to compel rescission must plead ability to repay. The court invoked this rule to dismiss the TILA rescission claim of the appellants, Scott and Lisa Sanders. It also dismissed the Sanderses' claims under the Equal Credit Opportunity Act and Fair Credit Reporting Act. We affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND AND PROCEDURAL HISTORY

In 2007, while the Sanderses were attempting to refinance their home, they discovered Salt Lake City Credit Union had "reported twelve new maxed-out accounts on the Sanders[es]' credit [reports]." (Aplt. App'x 139.) They say this "destroyed [their] credit and made it impossible to refinance." (*Id.*) Afterward, the credit union "apologized for the misreporting" and "offered to make amends by providing [them] with a 'free' refinance." (*Id.*) They accepted this conciliatory offer and closed on the refinancing loan in July 2007. Salt Lake City Credit Union later merged with appellee Mountain America. In March 2009, the Sanderses applied to Mountain America to again refinance their loan. They completed the application by phone, but Mountain America denied their application at the end of the call.

As pertinent to this appeal, the Sanderses' complaint alleges: (1) they had not been

provided with the disclosures required under the Truth-in-Lending Act (TILA) thereby entitling them to invoke statutory rescission; (2) Mountain America violated the Equal Credit Opportunity Act (ECOA) when it failed to provide a notice of adverse action after denying their application for refinancing; and (3) Mountain America's inaccurate credit reporting violated the Fair Credit Report Act (FCRA). The district court dismissed these claims on the pleadings. *See* Fed. R. Civ. P. 12(c).

## II. STANDARD OF REVIEW

An order dismissing a case on the pleadings is reviewed de novo. *Park Univ. Enters., Inc. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006). In this review, "we accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings" in that party's favor. *Id.* Judgment on the pleadings is appropriate only when "the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." *Id.* (quotations omitted).

## III. TRUTH-IN-LENDING ACT RESCISSION CLAIM

The Sanderses correctly contend the district court erred when it concluded they were not entitled to TILA rescission of their mortgage loan because they failed to plead their ability to repay the loan proceeds.[1]

---

[1] The Sanderses' complaint also sought damages under TILA. The district court concluded their damages claim was time-barred. The Sanderses have not appealed from this determination.

Congress enacted TILA in 1968 "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). TILA gives consumers the right to rescind certain consumer credit transactions secured by the "principal dwelling" of the credit applicant. 12 C.F.R. § 226.23(a)(1). Creditors are required to give consumers two copies of a disclosure advising them about the right of rescission. 15 U.S.C. § 1635(a); 12 C.F.R. § 226.23(b)(1).

TILA and its implementing regulation (known as Regulation Z, which is codified at 12 C.F.R. § 226) explain how and when a consumer may rescind. To exercise the TILA right to rescind, a consumer need only timely notify the creditor in writing. 12 C.F.R. § 226.23(a)(2). TILA's right of rescission expires the midnight of the third business day[2] following the later of the "consummation of the transaction" or the delivery of the required disclosures. 15 U.S.C. § 1635(a), (f). In any case, the right to rescind expires three years after the transaction is completed. 15 U.S.C. § 1635(f).

Here, according to the factual allegations in the Sanderses' complaint, which we accept as true, *see Park Univ. Enters.*, 442 F.3d at 1244, Mountain America provided only one copy (rather than the required two copies) of TILA's required disclosures. The Sanderses consummated their loan refinance on July 6, 2007. They timely notified

---

[2] "Theoretically, during the three-day delay the consumer is to reflect on the wisdom and desirability of the contract and on the risk of possible loss of the home." Ralph J. Rohner & Fred H. Miller, *Truth in Lending* 598 (2000).

Mountain America in writing of their rescission on March 2, 2010, before the TILA rescission right expired on July 6, 2010.

A.  Consumer's Obligation to Plead Ability to Repay

Nonetheless, Mountain America responds that, even if the Sanderses timely sought rescission, the district court properly used its equitable authority to reject their rescission because the Sanderses did not allege they can repay the loan proceeds.  We disagree.

"Rescission essentially restores the status quo ante; the creditor terminates its security interest and returns any [money] paid by the debtor in exchange for the latter's return of all disbursed funds or property interests." *McKenna v. First Horizon Home Loan Corp.*, 475 F.3d 418, 421 (1st Cir. 2007).  When a consumer rescinds under TILA, the creditor must—within 20 calendar days after receipt of a valid notice of rescission—return "any money or property that has been given to anyone," including any finance charges collected from the consumer.  12 C.F.R. § 226.23(d).  It must also "take any action necessary to reflect the termination of [its] security interest."  *Id.*  Until this has been done, the consumer may keep the loan proceeds.  *See id.* § 226.23(d)(3).  After the creditor satisfies these rescission obligations, the consumer must tender to the creditor the loan proceeds or their "reasonable value."  *Id.*

When consumers rescind during the three-day period following the consummation of the loan transaction, this process is clear and functions well.  *See* Board of Governors of the Federal Reserve System, Proposed Rule; Request for Public Comment, 75 Fed. Reg. 58539, 58629 (proposed Sep. 24, 2010).  On the other hand, as the Federal Reserve

Board of Governors acknowledged in a proposal to change Regulation Z:

> The process . . . does not work well . . . after the initial three-day period when the creditor has disbursed funds and perfected its lien, and the consumer's right to rescind may have expired. Most creditors are reluctant to release a lien under these conditions, particularly if the consumer is in default or in bankruptcy and would have difficulty tendering. Thus, when a creditor receives a consumer's notice after the initial three-day period, the rescission process is unclear and courts are frequently called upon to resolve rescission claims.

*Id.* When initiated after the initial three-day period, TILA rescission often imposes an unfair risk on creditors: it requires the creditor to release its security interest without assurance that the consumer stands ready to honor his or her own rescission obligations. *See Am. Mortg. Network, Inc. v. Shelton*, 486 F.3d 815, 820-21 (4th Cir. 2007); *see also In re Stanley*, 315 B.R. 602, 615-16 (Bankr. D. Kan. 2004) (explaining the rationale for equitable intervention in the TILA rescission process). This problem is particularly acute when the consumer resorts to TILA rescission because of an impending foreclosure or bankruptcy.[3] *See Shelton*, 486 F.3d at 820-21; *see also* Board of Governors of Federal Reserve System, *supra*, at 58628 ("[C]onsumers often assert the right to rescind in foreclosure or bankruptcy proceedings."). Thus, courts routinely exercise their equitable powers to ensure consumers can honor their rescission obligations before requiring

---

[3] The problem is even more acute here both because the notice of rescission came nearly three years after the parties completed the transaction and because the only rationale for allowing such a late rescission is a highly technical detail: Mountain America's alleged failure to comply with Regulation Z's requirement that it provide *two* copies of the required disclosure of the consumer's right to rescind under TILA. The Sanderses allege it supplied only one.

creditors to release their security interests. *See, e.g., Shelton*, 486 F.3d at 820-21*; Yamamoto v. Bank of New York,* 329 F.3d 1167, 1172-73, 1172 n.5 (9th Cir. 2003); *Williams v. Homestake Mortg.,* 968 F.2d 1137, 1142 (11th Cir. 1992). In light of this judicial practice, TILA and Regulation Z were amended in 1980 and 1981, respectively, to explicitly recognize that a court may entertain a creditor's petition for an order equitably modifying the rescission procedure. *Yamamoto*, 329 F.3d at 1171.

But here, the district court created a pleading rule that would require *all* consumers who seek to compel TILA rescission to plead their ability to repay the loan:

> [A]llowing the Sanders[es] to rescind the loan simply by stating their intent to rescind would place [Mountain America] in the position of an unsecured creditor. Thus equity requires that the Sanders[es] allege their ability to repay the loan amount. [They] have not alleged their ability to repay the loan. . . . *Because the [Sanderses] have not alleged their ability to repay the loan, their rescission claim fails and must be dismissed.*

(Aplt. App'x 143-44 (emphasis added).) The court's view impermissibly alters the rescission procedure for two reasons.

First, it adds a condition to the remedy not found in the statute or the regulation: it requires consumers to allege that they can repay the loan proceeds. This requires them to determine and plead information that may not be easily ascertainable, such as the value of the property obtained with the loan proceeds — a difficult task in a fluctuating market — and the exact dollar amount of any refund of finance charges due to them. *Compare* 12 C.F.R. § 226.23(a)(2) (requiring only that the consumer give the creditor written notice of rescission). Moreover, because this condition would apply only in court proceedings to

- 7 -

compel rescission, it encourages creditors to ignore TILA rescission notifications until the consumer petitions a court to compel the rescission. This delays the rescission process, makes it more expensive for consumers, and transforms what Congress intended to be a private remedial scheme into a courthouse showdown. *See McKenna*, 475 F.3d at 421-22 ("The rescission process is intended to be private, with the creditor and debtor working out the logistics of a given rescission.").

Second, the district court's pleading rule is impermissible because categorical relief is beyond the reach of the courts' equitable powers, both as a matter of equitable tradition and respect for the law. As tradition goes, the equitable power of the courts is available only when legal remedies are demonstrably inadequate. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 509 (1959) ("[I]n the federal courts equity has always acted only when legal remedies were inadequate."). Even when legal remedies are inadequate, courts must also weigh the case-specific equities in favor of both parties and the public interest before granting equitable relief. *See eBay Inc v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) ("[T]he Supreme Court has rejected the application of categorical rules in injunction cases."); *Yamamoto*, 329 F.3d at 1171 (noting relief from the TILA procedure depends on "the equities present in a particular case") (quotation omitted); S. Rep. No. 96-368, 96th Cong., 1st Sess. 29 (1979), *reprinted in* 1980 U.S.C.C.A.N. 236, 264 ("[A] court is authorized to modify [TILA's] procedures *where appropriate*.") (emphasis added). The district court's pleading rule would give all creditors the benefit of the more

burdensome pleading rule without requiring them to first show a need for equitable relief.

Further, out of respect for the rule of law, we must adhere to the procedure duly enacted by Congress and the responsible administrative agency except when the equities of a particular case require otherwise. "It is a longstanding maxim that equity follows the law." *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204, 1213 (2012) (Roberts, J. dissenting) (quotation omitted). This maxim is a reminder that courts may not invoke equity to craft a remedy inconsistent with the law. *See id.* Our equitable powers to "make an independent assessment of the equities and public interest [are] circumscribed to the extent Congress has already made such assessments with respect to the type of case before the court." *United States v. Mass. Water Res. Auth.*, 256 F.3d 36, 47 (1st Cir. 2001). Our respect for TILA and Regulation Z require us to refrain from invoking equitable powers except when there is a demonstrated need to depart from the procedure designated by law.

Although the rescinding consumer need not plead an ability to repay the proceeds of the loan, the district court may nevertheless, in an appropriate case, use its equitable powers to protect a creditor's interests during the TILA rescission process.[4] *See Brown v. Nat'l Permanent Fed. Sav. & Loan Ass'n*, 683 F.2d 444, 448 (D.C. Cir. 1982). The

---

[4] Indeed, we have gone so far as to affirm a district court's equitable decision to protect a creditor against forfeiture by awarding it interest for the time value of its money. *See Rachbach v. Cogswell*, 547 F.2d 502, 505 (10th Cir. 1976). *But see Semar v. Platte Valley Fed. Sav. & Loan Ass'n*, 791 F.2d 699, 705-06 (9th Cir. 1986) (concluding a court may not use its equitable powers to award lenders finance charges and suggesting *Rachbach* contravenes TILA's plain language).

pleadings here do not establish, however, whether this is an appropriate case. Mountain America never requested an order from the court altering the TILA rescission procedure. It merely asserted, in its motion for judgment on the pleadings, that "[c]ourts must look at equitable factors in determining what the parties must do to rescind a loan, including 'the borrower's ability to repay the proceeds.'" (Aplt. App'x 69.) Further, its motion to dismiss did not itself plead any facts justifying relief; it merely asserted, contrary to TILA and Regulation Z, the Sanderses were not entitled to rescission until they tendered "the loan proceeds." (Aplt. App'x 69.)

Thus, the district court erred in dismissing the Sanderses' rescission claim. We reverse its judgment on this issue and remand the case for further proceedings. We express no opinion on the merits of the TILA issue or as to Mountain America's entitlement to equitable relief on remand.[5]

B.   Money or Property

Because the issue may arise on remand, we also consider whether the Sanderses can satisfy their rescission obligations by tendering their home. We conclude the tender of the home does not necessarily meet their tender obligations under TILA.

The Sanderses read Regulation Z as allowing a consumer to tender either the loan

---

[5] "The courts, *at any time during the rescission process*, may impose equitable conditions to insure that the consumer meets his obligations after the creditor has performed his obligations as required by the act." *Williams*, 986 F.2d at 1142 (quoting S. Rep. No. 368, 96th Cong., 2d Sess. 29 (1980) (emphasis added), reprinted in 1980 U.S.C.C.A.N. 236, 265).

- 10 -

proceeds or the property obtained with the loan proceeds. Although we disagree with this view, we understand the confusion. The rescission provisions of Regulation Z provide: "[T]he consumer shall tender the *money or property* to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value." 12 C.F.R. § 226.23(d)(3) (emphasis added). This provision seems to contemplate the possibility that the consumer could tender the property obtained with the loan proceeds (or its reasonable value) to the creditor, even if that tender does not fully restore the creditor to the status quo ante.

However, the Federal Reserve System Board of Governors, which issues the regulations implementing TILA, including Regulation Z, adopts a different view:

> After the transaction is rescinded, the creditor must tender any money or property given to anyone in connection with the transaction within a specified time frame. The creditor's tender triggers the consumer's duty to return any money or property *that the creditor delivered to the consumer.*

*See* Truth in Lending, 69 Fed. Reg. 16769, 16772 (Mar. 31, 2004) (emphasis added); *accord* Ralph J. Rohner & Fred H. Miller, *Truth in Lending* 654 (2000) (concluding the consumer should tender "what was obtained from the creditor [rather than] what was done with what the creditor provided"). This view is the more logical reading of the regulation's reference to "money or property" because it is consistent with the hallmark of rescission—the restoration of the status quo ante.[6] *See McKenna*, 475 F.3d at 421;

---

[6] Nevertheless, the Federal Reserve System Board of Governors suggests that, to effect the deterrent aims of TILA, a court should first adjudicate the consumer's right to

*accord Shelton*, 486 F.3d at 820. Accordingly, the district court interpreted this provision of TILA correctly; the borrower cannot satisfy its rescission obligations by simply surrendering the property purchased with the loan proceeds regardless of whether doing it will restore the creditor to the status quo ante.

Nevertheless, until the district court determines what amount the Sanderses would owe to Mountain America to restore it to the status quo ante, we do not know whether their home's value can meet their repayment obligation. 12 C.F.R. § 226.23; *see generally Watkins v. SunTrust Mortg., Inc.,* 663 F.3d 232, 235 (4th Cir. 2011) (noting the rescinding borrower is entitled to a "refund of all amounts, *including finance charges*, paid in connection with the transaction") (emphasis added). We infer from the Sanderses' tender of their home that they would be willing to sell it or pay Mountain America to do so. *See Park Univ. Enters.,* 442 F.3d at 1244 (requiring reasonable inferences to be drawn in non-moving party's favor). Thus, whether the Sanderses' home is valuable enough, when combined with any refund owed to them (less the fair value of Mountain America's services in reselling the home, if the Sanderses so elect) to restore Mountain America to the status quo ante is a factual issue that cannot be resolved on the pleadings. On remand, if it becomes apparent the Sanderses cannot restore Mountain America to the status quo ante, Mountain America can seek summary judgment. *See Yamamoto,* 329 F.3d at 1172-73; *Williams,* 968 F.2d at 1142.

---

rescission before addressing the consumer's ability to return the loan proceeds to the creditor. Truth in Lending, 69 Fed. Reg. 16769, 16772.

## IV. EQUAL CREDIT OPPORTUNITY ACT CLAIM

Next, the Sanderses contend the district court erred in dismissing their ECOA claim for failure to provide notice of adverse action following the denial of their refinancing application. We again agree.

The ECOA requires creditors to notify credit applicants of an adverse action within thirty days after they receive a "completed application" for credit. 15 U.S.C. § 1691(d)(1). This notification must explain why the credit application was denied. *Id.* § 1691(d)(2). The term "completed application" means:

> [A]n application in connection with which a creditor has received all the information that the creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested (including, but not limited to, credit reports, any additional information requested from the applicant, and any approvals or reports by governmental agencies or other persons that are necessary to guarantee, insure, or provide security for the credit or collateral). The creditor shall exercise reasonable diligence in obtaining such information.

12 C.F.R. § 202.2(f).

The district court reasoned the Sanderses had not "provided a credit report or appraisal which certainly would be required in evaluating a real estate loan or modification. Because they do not claim to have submitted these critical documents, their application could not have been 'complete.'" (Appellant's App'x 145.)

This conclusion cannot be reconciled with the complaint's allegations that the application was complete and Mountain America denied the application at the end of the

- 13 -

call; we (and the district court) must accept these allegations as true.[7] *See Park Univ. Enters.*, 442 F.3d at 1244.  We do not know whether an appraisal was needed or whether Mountain America ordered its own credit reports, as creditors often do.  The district court's factual assumptions about the gap between what Mountain America regularly obtains during a telephone application and what it actually obtained from the Sanderses are inconsistent with its obligation to draw all reasonable inferences for the Sanderses as the non-moving party.  *See id.*

## V. FAIR CREDIT REPORT ACT CLAIM

Finally, the Sanderses contend the district court should not have dismissed their FCRA claim.  According to the complaint, Mountain America incorrectly reported the Sanderses had opened twelve new accounts having a total balance of over $22,000 to the credit reporting agencies.  They also allege it failed to timely rectify the errors; they blame the erroneous[8] reporting for their failed attempt to refinance with another lender.  They claim entitlement to damages under the FCRA for this erroneous reporting.  Rejecting their arguments, the district court concluded the FCRA gives consumers no

---

[7] The Sanderses' complaint alleges, "[a]n application was submitted to [Mountain America] in full over the phone. This application included all income, assets, work history, budget etc." (Aplt. App'x 39.)

[8] The Sanderses allege this reporting was not only erroneous, but fraudulent. According to the complaint, the credit union learned of their refinancing when the other lender, CitiWide Home Loans, checked their credit reports. Salt Lake City Credit Union then allegedly submitted false credit information to sabotage the pending refinance and stepped in disingenuously to capture their business.

- 14 -

private right of action against those who report credit information to a credit reporting agency.

The district court's interpretation is correct. The FCRA imposes a duty on persons who provide information to credit reporting agencies ("furnishers") to accurately report information. 15 U.S.C. § 1681s-2(a). While it also gives consumers a private right of action against those who violate its provisions, *see* 15 U.S.C. § 1681n (right of action against willful violators); 15 U.S.C. § 1681o (right of action against negligent violators), that right of action is limited to claims against the credit reporting agency; it does not extend to furnishers. 15 U.S.C. § 1681s-2(c); *Nelson v. Chase Manhattan Mortg. Corp.*, 282 F.3d 1057, 1059-60 (9th Cir. 2002); *see Pinson v. Equifax Credit Info. Servs., Inc.*, 316 F. App'x 744, 751 (10th Cir. 2009) (unpublished).[9]

This is not to say the Sanderses were without recourse to address Mountain America's inaccurate reporting. While "Congress did not want furnishers of credit information [to be] exposed to suit by any and every consumer dissatisfied with the credit information furnished," Congress allows consumers to enforce the duty of accurate reporting through the FCRA's dispute process. *Nelson*, 282 F.3d at 1060. When the furnisher receives notice of a dispute from the credit reporting agency, it must perform

---

[9] Although the Sanderses' brief argues their case does not rely on the duty to accurately report in § 1681s-2(a), [Op. Br. 17] this contradicts their complaint. Their complaint specifically alleged Salt Lake City Credit Union "failed to adhere to 15 U.S.C. 1681s-2, by *reporting false information* to the bureaus and then not rectifying the errors when confronted." (Aplt. App'x 45 (emphasis added).)

the verification and correction duties described in 15 U.S.C. § 1681s-2(b). *See Pinson*, 316 F. App'x at 751. While a breach of those duties might expose the furnisher to liability, *see* 15 U.S.C. § 1681s-2(c) (noting the private action limitation applies only to violations of the duties listed in § 1681s-2(a)), the Sanderses do not claim to have initiated this process. The district court did not err in dismissing this claim.

The judgment of the district court is AFFIRMED with respect to the Sanderses' FCRA claim. We REVERSE the district court's judgment with respect to the Sanderses' TILA rescission and ECOA claims and REMAND the case for further proceedings consistent with this opinion.