FILED
United States Court of Appeals
Tenth Circuit

October 13, 2016

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

THE ESTATE OF DAVID PAPADAKOS,
deceased; MICHAEL PAPADAKOS and
CATHERINE PAPADAKOS, the heirs of
David Papadakos,

     Plaintiffs - Appellants,

v.

L. VANCE NORTON, in his official and
individual capacity; LISA JORGENSEN,
in her official and individual capacity,

     Defendants - Appellees.

No. 15-4172
(D.C. No. 2:14-CV-00774-RJS)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

    David Papadakos committed suicide after he was arrested for and charged with

the alleged sexual abuse of his adopted son, B.P. After Papadakos' death, his estate

and his parents (collectively, the Estate) brought this action under 42 U.S.C. § 1983

against L. Vance Norton (a detective with the Vernal, Utah Police Department) and

Lisa Jorgensen (a social worker with the Utah Division of Child and Family

_____

[*] This order and judgment isn't binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. But it may be cited for its
persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

Services), alleging that they coerced B.P. into making false allegations against Papadakos. The district court granted Jorgensen's motion for judgment on the pleadings and Norton's motion for summary judgment. The Estate appeals. Because we agree with the district court that (1) the Estate's malicious-prosecution claim fails as a matter of law; and (2) the defendants are entitled to qualified immunity on the Estate's Fourth and Fourteenth Amendment claims, we affirm.

## BACKGROUND

Papadakos adopted B.P. in 2010. At the time, B.P. was twelve years old and had been in and out of foster care for more than half of his life. B.P. had also been the victim of repeated sexual abuse and suffered from numerous mental health problems.

In October 2012, B.P. ran away and went to a classmate's home after Papadakos threatened to ground him. B.P. told his classmate that Papadakos had sexually abused him. When Norton learned of this allegation, he attempted to interview B.P. at his classmate's home. But B.P. refused to speak with Norton.

The next day, Jorgensen interviewed B.P. at B.P.'s school. After the interview, Norton arranged for B.P.'s transport to the Children's Justice Center. Despite B.P.'s protests, defendants questioned B.P. there for several hours over the course of multiple days. According to the Estate, both Jorgensen and Norton (collectively, the defendants) coerced and intimidated B.P. during these interviews and supplied him with the information that they wanted to hear until B.P. finally alleged that

2

Papadakos sexually abused him on multiple occasions. For instance, B.P. alleged that while camping with Papadakos, B.P. awoke in their shared tent to find Papadakos' hand on B.P.'s penis.

Based on these allegations, Norton questioned Papadakos. Papadakos told Norton that he remembered the camping incident. But he maintained that any contact with B.P.'s penis was accidental and must have occurred while Papadakos was asleep. Papadakos also admitted that he and B.P. often slept together in Papadakos' bed at home and that Papadakos once awoke to find B.P. rubbing B.P.'s erect penis on Papadakos' hand. Papadakos reported that on at least 30 different occasions, B.P. removed Papadakos' underwear while Papadakos slept. Finally, when Norton asked Papadakos if it was possible that Papadakos was playing with B.P.'s penis while Papadakos was asleep, Papadakos replied that he wasn't sure.

Norton arrested Papadakos without a warrant on October 25, 2012. That same day, Utah charged Papadakos with two counts of aggravated sexual abuse of a child and ten counts of forcible sexual abuse. As a result, Papadakos lost his job as the vice principal of a middle school, was expelled from a university graduate program, and was no longer allowed to participate in the Boy Scouts of America. Shortly before his preliminary hearing date, Papadakos committed suicide.

The Estate then sued the defendants under 42 U.S.C. § 1983, alleging that they

violated Papadakos' Fourth, Fifth,[1] and Fourteenth Amendment rights by coercing B.P. into making false allegations of sexual abuse and by using those false allegations to arrest and charge Papadakos. The Estate also brought a malicious prosecution claim against both the defendants.[2]

Jorgensen filed a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c). In support, Jorgensen argued that she was entitled to qualified immunity on the Estate's constitutional claims. And she asserted that the Estate's malicious-prosecution claim failed as a matter of law because the criminal prosecution against Papadakos didn't terminate in his favor.

Similarly, Norton filed a motion for summary judgment under Fed. R. Civ. P. 56. Like Jorgensen, Norton maintained that (1) he was entitled to qualified immunity on the Estate's constitutional claims, and (2) the Estate's malicious-prosecution claim failed as a matter of law.

The district court granted both motions and dismissed the Estate's action with

---

[1] As the district court pointed out below, the Estate failed to cite any authority that might support its Fifth Amendment claim. Because the Estate neither disputes the district court's characterization of its Fifth Amendment claim below nor attempts to fully develop that claim on appeal, we confine our analysis to its Fourth and Fourteenth Amendment claims. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) (noting that "[a]rguments inadequately briefed in the opening brief are waived").

[2] To the extent that the Estate also asserted any state-law claims against Norton, the district court concluded that the Estate abandoned those claims below. And the Estate doesn't challenge that ruling in its opening brief. Accordingly, the Estate has waived any challenge to the district court's ruling. *See Adler*, 144 F.3d at 679.

prejudice. The Estate appeals.

DISCUSSION

We review the district court's decision granting Norton's motion for summary judgment de novo, applying the same legal standard as the district court and viewing the evidence in the light most favorable to the Estate. *See Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1196 (10th Cir. 2015). "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

Likewise, we review the district court's decision granting Jorgensen's motion for judgment on the pleadings de novo, "'accept[ing] all facts pleaded by the non-moving party as true and grant[ing] all reasonable inferences from the pleadings' in that party's favor." *Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1141 (10th Cir. 2012) (quoting *Park Univ. Enters. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006)). "Judgment on the pleadings is appropriate only when 'the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'" *Id.* (quoting *Park Univ. Enters.*, 442 F.3d at 1244).

**I.    We decline to consider the Estate's assertion that we should adopt and apply an exception to the favorable-termination requirement to save its malicious-prosecution claim.**

We begin with the Estate's malicious-prosecution claim. The district court concluded that this claim failed as a matter of law as to both the defendants because

5

the underlying criminal prosecution didn't "terminate[] in favor of" Papadakos. *Novitsky v. City of Aurora*, 491 F.3d 1244, 1258 (10th Cir. 2007) (listing "elements of the common law tort of malicious prosecution, as applicable in a § 1983 claim"). Instead, Utah dismissed the case against Papadakos based on Papadakos' death—a decision that, as the district court pointed out, didn't resolve the question of Papadakos' guilt or innocence. *See M.G. v. Young*, 826 F.3d 1259, 1262 (10th Cir. 2016) ("Where the case is disposed of in a manner that leaves the question of the accused's innocence unresolved, there generally can be no malicious prosecution claim by the accused." (quoting *Dobiecki v. Palacios*, 829 F. Supp. 229, 235 (N.D. Ill. 1993))).

On appeal, the Estate doesn't dispute that a plaintiff must generally satisfy the favorable-termination requirement in order to succeed on a malicious-prosecution claim under § 1983. Nor does it assert that a plaintiff's death typically satisfies that requirement, let alone cite any authority that would support such an assertion. Instead, the Estate urges us to carve out an exception to the favorable-termination rule for circumstances in which a defendant's wrongful conduct allegedly caused the plaintiff's death "before a favorable termination could take place." Aplt. Br. 31. Without such an exception, the Estate explains, defendants might "benefit from their wrongful conduct," thus undermining § 1983's goal of "preventi[ng] . . . abuses of power by those acting under the color of state law and compensat[ing] . . . persons injured by deprivation of federal rights." *Id.*

6

But the only authorities the Estate offers to support this argument are *Berry v. City of Muskogee*, 900 F.2d 1489 (10th Cir. 1990), and *Robertson v. Wegmann*, 436 U.S. 584 (1978). And while we agree that these cases support the Estate's characterization of § 1983's underlying goals, *see Wegmann*, 436 U.S. at 590–91, *Berry*, 900 F.2d at 1503, the Estate doesn't explain how these authorities—or any others, for that matter—might establish that applying the favorable-termination requirement in this case would be so contrary to § 1983's goals as to warrant an exception to the general favorable-termination rule as articulated in *M.G.*, 826 F.3d at 1262.

Accordingly, we find this argument insufficiently briefed and decline to address it. *See* Fed. R. App. P. 28(a)(8)(A) (requiring argument section of appellant's brief to contain "appellant's contentions and the reasons for them, with citations to the authorities . . . on which the appellant relies"); *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) (explaining that court routinely declines to consider inadequately briefed arguments).

## II. The defendants are entitled to qualified immunity on the Estate's Fourth Amendment claim because Norton had arguable probable cause to arrest Papadakos.

In response to the Estate's allegation that the defendants violated Papadakos' clearly established Fourth Amendment rights, both the defendants asserted that they were entitled to qualified immunity. To defeat that assertion, the Estate must demonstrate that (1) the defendants violated Papadakos' Fourth Amendment rights;

7

and (2) those rights were clearly established at the time that the defendants allegedly violated them. *See Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016).

According to the Estate, Norton relied on B.P.'s coerced statements—which Jorgensen allegedly helped to obtain—to arrest Papadakos. The Estate implies that the defendants knew those statements were false. And it points out "that false evidence cannot contribute to a finding of probable cause." *Wilkins v. DeReyes*, 528 F.3d 790, 805 (10th Cir. 2008). Thus, it concludes, Norton lacked probable cause to arrest Papadakos, and Papadakos' arrest therefore violated his clearly established Fourth Amendment rights. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) ("A police officer violates an arrestee's clearly established Fourth Amendment right to be free of unreasonable seizure if the officer makes a warrantless arrest without probable cause.").[3]

But the Estate acknowledges that "[w]here false statements have been relied on to establish probable cause, 'the existence of probable cause [for § 1983 purposes] is determined by setting aside the false information.'" *Wilkins*, 528 F.3d at 805 (alteration in original) (quoting *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir.

---

[3] Because we ultimately conclude that Papadakos' arrest didn't violate his clearly established Fourth Amendment rights, we find it unnecessary to determine whether Jorgensen's alleged contribution to that arrest—i.e., her participation in obtaining B.P.'s allegedly false statements—is sufficient to support a Fourth Amendment claim against her under § 1983. *Cf. Pierce v. Gilchrist*, 359 F.3d 1279, 1293 (10th Cir. 2004) (concluding that forensic analyst who "distort[ed] evidence to convince the prosecuting authorities to press charges" couldn't "'hide behind' the fact that she neither initiated nor filed the charges against" plaintiff).

1996)). Thus, even assuming that Norton knowingly relied *in part* on false statements to arrest Papadakos, the Estate appears to recognize that the defendants only violated Papadakos' Fourth Amendment rights if, after "setting aside" those allegedly false statements, *see id.*, Norton lacked probable cause to arrest Papadakos.

Moreover, the Estate must do more than show that Norton lacked probable cause to arrest Papadakos to succeed on its Fourth Amendment claim. To defeat the defendants' assertion of qualified immunity, the Estate must show that Norton lacked even *arguable* probable cause to arrest Papadakos. *See Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) ("In the context of a qualified immunity defense on an unlawful search or arrest claim, we ascertain whether a defendant violated clearly established law 'by asking whether there was "arguable probable cause"' for the challenged conduct." (quoting *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012))). And "[a]rguable probable cause" exists so long as an officer's "conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Id.* Thus, the defendants are entitled to qualified immunity on the Estate's Fourth Amendment claim if, after removing B.P.'s allegedly false statements from the calculation, "a reasonable officer could have believed that probable cause existed to arrest or detain" Papadakos. *Id.* (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007)).

We conclude that arguable probable cause existed here.

In addition to B.P.'s allegedly false statements, Norton also relied on

(1) B.P.'s classmate's statement that B.P. said he ran away from home because Papadakos sexually abused him; and (2) Papadakos' own statements to Norton. For instance, Papadakos verified that he and B.P. often slept together in the same bed. Papadakos remembered the camping trip during which B.P. accused Papadakos of touching B.P.'s penis, but maintained that Papadakos could have only initiated the contact while he was asleep. He described an incident in which he awoke to find B.P. rubbing his erect penis on Papadakos' hand. And he reported that on at least 30 occasions, he awoke to find that B.P. had removed Papadakos' underwear while Papadakos slept. Finally, when Norton asked Papadakos if it was possible that Papadakos played with B.P.'s penis, Papadakos didn't deny that it was possible; he merely maintained that he couldn't be sure what he did in his sleep.

Even assuming that B.P.'s classmate's statement and Papadakos' own statements were insufficient to provide Norton with *actual* probable cause to arrest Papadakos, we conclude that those statements were sufficient to provide Norton with *arguable* probable cause to believe that Papadakos committed the offense of sexual abuse of a child. *See* Utah Code. Ann. § 76-5-404.1(2) ("A person commits sexual abuse of a child if . . . the actor touches the . . . genitalia of any child . . . with the intent to arouse or gratify the sexual desire of any person . . . ."); *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011) (explaining that probable-cause evaluation doesn't "require the suspect's guilt to be 'more likely true than false,'" but rather asks only "whether a 'substantial probability' existed that the suspect committed the crime"

10

(first quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983); then quoting *Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996))).

In other words, we conclude that after removing B.P.'s allegedly false and coerced statements from the probable-cause calculation, "a reasonable officer could have believed that probable cause existed to arrest or detain" Papadakos for violating § 76-5-404.1(2). *Stonecipher*, 759 F.3d at 1141 (quoting *Cortez*, 478 F.3d at 1120). Thus, Papadakos' arrest didn't violate his clearly established Fourth Amendment rights, and the defendants are entitled to qualified immunity on the Estate's Fourth Amendment claim. *See id.*

## III. The defendants are entitled to qualified immunity on the Estate's Fourteenth Amendment claim because the Fourth Amendment—rather than the Fourteenth Amendment—governs pretrial liberty deprivations.

Finally, we turn to the Estate's assertion that the defendants violated Papadakos' clearly established Fourteenth Amendment rights.

First, the Estate suggests that the defendants violated Papadakos' clearly established Fourteenth Amendment rights by violating Utah Code Ann. § 62A-4a-202.1(1)(a). But even assuming that the defendants violated § 62A-4a-202.1(1)(a), "a state's violation of its own laws does not create a claim under § 1983." *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 947 (10th Cir. 2003).[4]

---

[4] True, "state statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment." *Vitek v. Jones*, 445 U.S. 480, 488 (1980). But whether a state statute creates such a liberty interest turns on multiple factors, none of which the Estate even attempts to

11

Next, citing *Clanton v. Cooper*, 129 F.3d 1147 (10th Cir. 1997)*,* the Estate asserts that the defendants violated Papadakos' clearly established Fourteenth Amendment rights by using B.P.'s allegedly coerced statements to arrest Papadakos and to initiate criminal charges against him.

In *Clanton*, we held that a government actor violated the plaintiff's clearly established due process rights under the Fourteenth Amendment by obtaining a third party's involuntary confession and then using that involuntary confession to arrest and imprison the plaintiff. *Id.* at 1152, 1159. But we reached that conclusion without evaluating whether such a substantive due process claim could survive the Supreme Court's decision in *Albright v. Oliver*, 510 U.S. 266 (1994) (plurality opinion). And when we explicitly analyzed that question a decade after deciding *Clanton*, *see Becker v. Kroll*, 494 F.3d 904, 917–19, 922–24 (10th Cir. 2007), we implicitly overruled *Clanton* to the extent it suggests that a plaintiff may bring a Fourteenth Amendment claim under these circumstances.[5]

---

address here. *See Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 464–65 (1989) (concluding that certain regulations didn't "establish a liberty interest entitled to the protections of the Due Process Clause" because they "lack[ed] the requisite relevant mandatory language"). Because we find the single sentence that the Estate dedicates to this argument insufficient to adequately brief the issue, we decline to consider it. *See* Fed. R. App. P. 28(a)(8)(A); *Bronson*, 500 F.3d at 1104.

[5] A panel of this court lacks authority to overrule a previous panel's holding absent en banc rehearing or an intervening Supreme Court decision. *United States v. Brooks*, 751 F.3d 1204, 1209 (10th Cir. 2014). But this general rule doesn't apply to "[q]uestions which merely lurk in the record," and are "neither brought to the attention of the [previous panel] nor ruled upon." *See United Food & Commercial Workers Union, Local 1564 v. Albertson's, Inc.*, 207 F.3d 1193, 1199 (10th Cir.

In *Becker*, we concluded that "the unavoidable construction of *Albright* is that no § 1983 claim will arise from filing criminal charges without probable cause under the substantive due process protections of the Fourteenth Amendment." *Id.* at 918. Instead, "the Fourth Amendment govern[s] 'pretrial deprivations of liberty.'" *Taylor v. Meacham*, 82 F.3d 1556, 1560 (10th Cir. 1996) (quoting *Albright*, 510 U.S. at 274). And while we recognized that exceptions to this general rule might exist—e.g., "where some quantum of harm occurs in the interim period after groundless criminal charges are filed but before any Fourth Amendment seizure," *Becker*, 494 F.3d at 922 (quoting *Albright*, 510 U.S. at 291 (Souter, J., concurring)), such an exception wouldn't apply here because Papadakos was arrested and charged on the same day.

In light of the Supreme Court's holding in *Albright* and our opinions in *Becker* and *Taylor*, we conclude that Papadakos had no substantive due process right under the Fourteenth Amendment to remain free from being arrested for, or charged with, a crime based on the allegedly coerced statements of a third party. *See Taylor*, 82 F.3d at 1560 (concluding that "Fourteenth Amendment substantive due process standards ha[d] no applicability" to plaintiff's allegation "that his wrongful arrest and seven-week detention constituted an unreasonable seizure and deprivation of his liberty, in violation of the Fourth, Fifth and Fourteenth Amendments," and proceeding to address plaintiff's claim solely under Fourth Amendment framework). Thus, the

2000) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)). Because we didn't explicitly address *Albright*'s impact in *Clanton*, "there [was] no holding on th[at] particular . . . issue to which" the *Becker* court had to "defer." *Id.*

13

defendants didn't violate Papadakos' Fourteenth Amendment rights by obtaining and using B.P.'s allegedly coerced statements to arrest Papadakos and initiate a criminal prosecution against him. And because the defendants didn't violate Papadakos' Fourteenth Amendment rights, they are entitled to qualified immunity on the Estate's Fourteenth Amendment claim. *See Mayfield*, 826 F.3d at 1255.

## CONCLUSION

Viewed from any angle, this case is a tragic one. But that fact cannot inform our legal analysis. The defendants are entitled to qualified immunity on the Estate's constitutional claims because they didn't violate Papadakos' constitutional rights. And the district court correctly granted judgment in the defendants' favor on the Estate's malicious-prosecution claim because the underlying criminal prosecution didn't terminate in Papadakos' favor. Accordingly, we affirm the district court's orders granting Jorgensen's motion for judgment on the pleadings and Norton's motion for summary judgment. As a final matter, we grant Norton's motion to maintain the seal on the video recordings of B.P.'s interviews.

Entered for the Court

Nancy L. Moritz
Circuit Judge