**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 20, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

BRUCE L. BRUNSON,

        Plaintiff - Appellant,

v.

PROVIDENT FUNDING ASSOCIATES;
JAMES WOODALL; MAX DEFAULT
SERVICES,

        Defendants - Appellees.

No. 13-4029
(D.C. No. 2:10-CV-00795-DN)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **O'BRIEN**, and **GORSUCH**, Circuit Judges.

If nothing else, this case illustrates the necessity of judicial restraint. Assuming

Bruce Brunson's allegations and his supporting evidence accurately state the facts and

fairly capture all relevant circumstances, it appears Provident Funding Associates

(Provident) did not treat him, its customer, well. In fact, the Provident team seems much

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id.*

like The Gang That Couldn't Shoot Straight[1]. But it is not our place to pass judgment on Provident's business practices.  Courts have no roving commission to "do good."  They are, quite properly, constrained to applying the law in deciding the issues presented and nothing more, unsettling as that may sometimes be.  So guided, we set emotion aside and decide the issues here presented.

Provident initiated foreclosure proceedings on Brunson's home because he was seven months behind on his mortgage payments.  That was a different case, but it precipitated this one. In this case Brunson seeks damages, claiming Provident negligently led him to believe he could avoid foreclosure if he continued to make monthly payments, but that did not happen.[2]  He also argues Provident violated the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681-1681x, and the Real Estate Settlement and Procedures Act (RESPA), 12 U.S.C. §§ 2601-2617.  He appeals from a summary judgment entered in favor of Provident.[3]  We affirm.

## I. Factual Background

The parties are well familiar with the facts, so we touch on them only briefly. In November 2004, Brunson borrowed $98,000 from Provident and used his home in Salt

---

[1]  Jimmy Breslin, The Gang That Couldn't Shoot Straight (1969).

[2] Interestingly, and significantly, no contract claims are included in Brunson's complaint and no contract remedies, such as reformation, were sought.  Nor was a promissory estoppel claim put forward. *But see infra* n.20.  Understandably, plaintiffs prefer tort remedies to contract remedies, but that preference cannot serve to turn two pair into a straight flush.

[3] Brunson does not appeal from the summary judgment entered in favor of Max Default Services or James Woodall, other defendants in the district court.

Lake City, Utah, as collateral for the thirty-year loan, which called for a fixed interest rate for three years and an adjustable rate thereafter. From January through July 2008, Brunson failed to make the required monthly payments ($1,148.22).[4] Provident began foreclosure proceedings and scheduled the sale of the home for July 30, 2008. The day before the sale and after an unsuccessful attempt to modify the loan,[5] Brunson filed a Chapter 13 bankruptcy petition resulting in an automatic stay, *see* 11 U.S.C. § 362, and preventing the foreclosure. Provident updated Brunson's account to reflect the bankruptcy filing by placing it in its "bankruptcy module." (Joint App'x, Vol. 4 at 1112.)

Brunson's proposed bankruptcy plan acknowledged arrearages ($12,116.90) on the debt he owed to Provident (approximately $109,000). It called for him to make his regular monthly payments to Provident and, in addition, remit $201.95 a month to the bankruptcy trustee to be applied to the arrearages. The bankruptcy case was dismissed in October 2008 because Brunson's lawyer failed to file a required form. Although the bankruptcy court notified Provident of the dismissal and Provident's bankruptcy

---

[4] In parts of the record, Brunson said he was working overseas at the time the loan went into default and his employer failed to make his monthly mortgage payments as it was required to do under the employment contract. He subsequently obtained a judgment against the employer for $888,753.75 but has been unable to collect. However, at the hearing to decide whether to dissolve the preliminary injunction, Brunson said he returned to the country in September 2007—at least three months before his first default.

[5] On March 31, 2008, Brunson sought a loan modification from Provident. Provident claims it denied his request because he did not have sufficient income (indeed he did not list any income). Brunson, however, alleged Provident told him it had no incentive to work with him because it could profit from a foreclosure as his home's value far exceeded the amount owed.

specialists have access to PACER,[6] Provident did not remove Brunson's account from its bankruptcy module.

After the dismissal of his bankruptcy case, Brunson enlisted the assistance of Michael Blackburn, Chief Operations Officer of Perfect Home Living, a nonprofit organization affiliated with the United States Department of Treasury's Homeownership Preservation Task Force. Its purpose is to help homeowners avoid foreclosure. Brunson and Blackburn made numerous calls to Provident in late 2008 seeking a loan modification. They were repeatedly informed by Provident that its records showed Brunson to still be in bankruptcy. Brunson and Blackburn told Provident the bankruptcy had been dismissed but Provident did not remove the account from its bankruptcy module. Nevertheless, it directed Brunson to continue making payments.

Brunson did so, making monthly payments to Provident from August 2008 to November 2009. Although an interest rate adjustment lowered his monthly payment from $1,148.22 to $1,102.20 in January 2009, he continued to make the higher payment.[7] Provident applied these payments to the defaulted amount. For example, Provident applied the August 2008 payment to the January 2008 payment, the September 2008 payment to the March 2008 payment, the October 2008 payment to the February 2008

---

[6] PACER stands for "Public Access to Court Electronic Records." As its name suggests, PACER "is an electronic public access service that allows users to obtain case and docket information online from federal appellate, district, and bankruptcy courts. . . ." *See* https://www.pacer.gov (last visited Apr. 15, 2015).

[7] There is no evidence in the record that Brunson made any payments to the bankruptcy trustee as called for in the proposed bankruptcy plan.

payment, the November 2008 payment to the April 2008 payment and so forth; his last payment, in November 2009, was applied to the April 2009 payment.[8] Thus, even while making payments, Brunson continued to remain seven months in arrears.

On December 1, 2009, Provident sent Brunson a letter giving notice of another interest rate adjustment. The letter stated the payment due on January 1, 2010, would decrease from $1,102.20 to $990.06, and the loan balance was $95,088.94 "assuming [Brunson had] made all payments when due." (Joint App'x, Vol. 4 at 914.) Inexplicably, three weeks later, Brunson received a letter from Provident rejecting his December 2009 payment as "short." (*Id.* at 915.) The letter instructed him to call Provident. On December 28, 2009, Brunson spoke with James Karanfiloglu, Provident's service compliance manager, who told him Provident had mistakenly maintained his account in its bankruptcy module even after the bankruptcy case had been dismissed and did not discover its mistake until December 2009.[9] Karanfiloglu told Brunson his payments had been applied to the arrearages and he remained seven months behind in his payments.[10]

Brunson responded the next day (December 29) with a "Qualified Written

---

[8] It is unclear why the September 2008 and October 2008 payments were applied to the March 2008 and February 2008 payments, respectively, and not vice versa.

[9] Karanfiloglu attributed Provident's mistake to employee turnover—the employee assigned to manage Brunson's account while his bankruptcy case was pending left Provident near the time the case was dismissed.

[10] That accurately states the terms of the loan documents.

Request" (QWR)[11] seeking documentation from Provident pursuant to RESPA.[12]

Brunson also ceased making payments because Provident told him the monthly payments would not be accepted unless he brought his account to no more than one month delinquent.[13] Despite this dispute, on December 31, 2009, Provident's Annual Tax and Interest Statement to Brunson did not indicate his payments were past due.[14]

Brunson hired an attorney who sent another QWR on January 20, 2010. Five days later, Provident sent Brunson a notice of default stating he must pay $10,066.92 plus his monthly payment within thirty days to bring his loan current and prevent foreclosure. On January 28, Provident responded to the January 20 QWR.[15] Although it questioned the propriety of the QWR, Provident provided Brunson the loan documents, his payment

---

[11] A QWR is "a written correspondence . . . that . . . includes, or otherwise enables the servicer to identify, the name and account of the borrower" and "includes a statement of the reasons for the belief of the borrower . . . that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B).

[12] Brunson did not receive a response from Provident; Provident claims it did not receive this QWR.

[13] Provident's normal business procedure regarding defaulted accounts is "to accept no less than 6 monthly payments, or the amount necessary for the account to be no more than one month delinquent." (Joint App'x, Vol. 4 at 900.) The loan documents, in turn, stated Provident "may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current." (Joint App'x, Vol. 2 at 348.) Thus, according to Provident, had it properly noted the bankruptcy dismissal, it would have returned any monthly payment thereafter as insufficient to cure the seven-month default.

[14] According to Karanfiloglu, year-end statements do not reference delinquencies on the account. However, if an account is delinquent, the amount of interest reflected on the statement would be lower than if the account had remained current.

[15] Brunson claims this response was not received until late February 2010.

- 6 -

history, and an assistance package to be completed if he sought a loan modification. On March 24, 2010, Provident sent a more detailed response to the QWR. It explained its failure to remove his account from the bankruptcy module and gave him thirty days to bring the account current and avoid foreclosure. At this point, Provident notified Brunson he must pay $19,619.58 to cure the default; this amount included not only the missed payments but also other fees including over $7,000 in legal fees. In May 2010, when Brunson did not cure the default, Provident transferred his account to its foreclosure department.

## II. Procedural Background

Brunson filed his initial complaint against Provident in August 2010. The next month he filed an ex parte motion for a temporary restraining order (TRO) and preliminary injunction to halt the foreclosure proceedings set for September 22, 2010. He also submitted an amended complaint alleging negligent misrepresentation and violations of FCRA and RESPA. After providing notice to Provident and holding a hearing, the district judge granted the TRO. The judge held another hearing where Provident informally agreed to a preliminary injunction.

Fifteen months later, Provident moved to dissolve the preliminary injunction. The parties agreed the negligent misrepresentation claim was the only claim which could support injunctive relief. As to this claim, Brunson testified to his belief that the bankruptcy trustee and Provident had reached an agreement to cure the arrearages or place them on the rear of the loan. The judge granted Provident's motion. He concluded Brunson's belief that his arrearages had either been cured or placed on the end of the loan

was not the product a misrepresentation by Provident but rather "a mistake on his part. . . . [Brunson] has clearly testified that Provident never represented that the arrearage was resolved or put on the rear." (Joint App'x, Vol. 4 at 1182-83.) The judge further rejected Brunson's reliance on Provident's acceptance of his monthly payments, the interest rate adjustment letter, and the tax and interest statement. He concluded none of these constituted a representation as to the existence or lack of an arrearage. Even assuming there was a misrepresentation by Provident about the bankruptcy case remaining pending, the judge determined any reliance by Brunson on this misrepresentation was unreasonable because he knew the bankruptcy case had been dismissed.

Provident then moved for summary judgment on all claims. The judge granted the motion. Relying on the same reasoning he used to dissolve the preliminary injunction, he determined Provident was entitled to judgment on the negligent misrepresentation claim because Brunson could not satisfy the "misrepresentation" and "reasonable reliance" elements of the claim.[16] (Joint App'x, Vol. 4 at 886.) He rejected Brunson's FCRA and RESPA claims because, among other things, no private right of action exists for violations of FCRA relating to the furnishing of information to a credit reporting agency (absent a dispute from Brunson) and Provident had timely responded to the QWRs as required by RESPA.

---

[16] The judge also decided the negligent misrepresentation claim was barred by the economic loss rule, the statute of frauds, and the terms of the loan. As we will explain, we need not rely on these grounds to affirm.

### III. Discussion

"We review a district court's decision to grant summary judgment de novo, applying the same standard as the district court." *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1178 (10th Cir. 2013) (quotations omitted). "Summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

A. *Negligent Misrepresentation*

The district judge cited several reasons for granting summary judgment to Provident on Brunson's negligent misrepresentation claim. *See supra* n.16. We need only concern ourselves with one—Brunson's failure to show reasonable reliance on a misrepresentation by Provident. Under Utah law, negligent misrepresentation claims require "reasonable reliance on a misrepresentation of material fact." *Olsen v. Univ. of Phoenix*, 244 P.3d 388, 390 (Utah Ct. App. 2010). Reasonable reliance is often a question of fact unsuitable for summary judgment. *Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1067 (Utah 1996). But when the relevant facts are not contradicted, the issue may be resolved as a matter of law.[17] *Id.*

---

[17] Brunson complains the judge improperly made findings of fact at the summary judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). The judge's order granting Provident's summary judgment motion did contain "Findings of Fact." (Joint App'x, Vol. 4 at 881.) But it appears the order was prepared by Provident upon the judge's instruction "to prepare a proposed order [outlining] the undisputed facts and apply[ing] the relevant [law]." (*Id.*) Thus, the "Findings of Fact"

(Continued . . .)

Brunson claims Provident negligently misrepresented to him that his arrearages had been forgiven or relegated to the end of his loan. Yet, as he conceded in the district court, no one at Provident explicitly told him so. Nevertheless, he maintains "Provident made numerous representations that allowed [him] and Mr. Blackburn to reasonably conclude that such an arrangement had been reached." (Appellant's Op. Br. at 42.) These representations include (1) Provident's instruction to keep making his monthly payments even after he told several of its representatives he was no longer in bankruptcy, (2) its acceptance of his payments for sixteen months, and (3) the 2009 interest rate adjustment letter and Annual Tax and Interest Statement which did not identify any delinquencies or late charges. He also claims as reasonable his reliance on these representations as an indication that some sort of post-bankruptcy arrangement had been reached. According to his testimony, he discovered, after some research on the Internet, dealing with other creditors, and speaking with Blackburn, that creditors usually do not

---

section should have been more appropriately titled "Undisputed Facts." In any event, our de novo review requires us to "view the evidence and draw reasonable inferences therefrom in the light most favorable to the non-moving party" (Brunson) and determine whether a genuine issue of material fact exists. *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (quotations omitted). We have done so.

Brunson also maintains the judge erroneously relied on his prior order granting Provident's motion to dissolve the preliminary injunction in deciding to grant summary judgment because the legal standards governing each are different. We see no error. While the judge applied the same reasoning to resolve both motions as to the negligent misrepresentation claim (i.e., failure to show a misrepresentation and reasonable reliance), he applied the correct legal standard to each. *See Commc'ns Maint., Inc. v. Motorola, Inc.*, 761 F.2d 1202, 1205 (7th Cir. 1985) (stating one of the concerns of adopting findings and conclusions of law from the preliminary injunction stage in ruling on a summary judgment motion is the different legal standards applicable to each).

accept less than the amount necessary to bring a delinquent account current. Based upon that assumption and because Provident told him to keep making payments and accepted his payments without seeking foreclosure, he reasonably assumed some sort of post-bankruptcy deal had been struck. Further, he continued to make monthly payments of $1,148.22 even after an interest rate adjustment lowered the payment to $1,102.20. He maintains these overpayments supported his reasonable belief Provident was applying the additional funds to his arrears. We disagree.

Brunson knew he was seven months in arrears in 2008. Indeed, he filed for bankruptcy to avoid foreclosure and admitted his debt to Provident in his proposed bankruptcy plan. He also knew his bankruptcy case had been dismissed before he made any payments to the bankruptcy trustee to address the arrearages. Moreover, he retained the services of Perfect Home Living after the dismissal of his bankruptcy case to assist him in securing a loan modification from Provident. Nevertheless, he claims he believed something had been worked out in bankruptcy, either his delinquency had been cured or it had been placed on the end of his loan. As incredulous as this seems, we accept his claim to having held such a <u>subjective</u> belief. But that is not to say his belief was <u>objectively</u> reasonable.

Since Brunson is seeking to hold Provident liable for his mistaken belief, the issue is whether Provident's "misrepresentations" caused Brunson's misbelief and, if so, whether he reasonably relied on them. There is no evidence of a direct misrepresentation in this case. Instead, Brunson relies on the December 1, 2009 interest rate adjustment letter and the December 31, 2009 Annual Tax and Interest Statement. He claims neither

document indicated he was delinquent. But the interest rate adjustment letter specifically stated it assumed Brunson was not in default and the Annual Tax and Interest Statement was not sent until <u>after</u> Provident had provided him notice of the default. Concluding those matters amounted to Provident's representation that the arrearages had been cured or placed at the end of the loan was unreasonable. Moreover, as we will explain, both documents were sent after Brunson was told by Provident that its records showed he was still in bankruptcy. Thus, even assuming these documents would cause a reasonable person to believe his account was in good standing, Brunson is not entitled to such an assumption because in spite of them he knew Provident misunderstood the status of his bankruptcy case.

That leaves Provident's instruction to Brunson to keep making his monthly payments and its corresponding acceptance of those payments for sixteen months despite its policy (and, ostensibly, that of other creditors) to accept no less than the amount necessary to bring a delinquent account current. But the instruction and acceptance say nothing about the status of Brunson's default. Assuming, arguendo, they constitute a misrepresentation does not help Brunson because, at bottom, his reliance upon them (without reading something additional into them) was not reasonable. That is so because when Brunson and Blackburn contacted Provident after the bankruptcy case was dismissed, it told them its records showed Brunson to still be in bankruptcy. While Provident was wrong and was told so, Brunson nevertheless knew Provident continued to

mistakenly believe he was still in bankruptcy. Yet, rather than continuing his attempt to correct Provident's misunderstanding or escalating his concerns,[18] Brunson simply stopped calling and made his payments. While he could hope the situation went undiscovered, it was not reasonable for him to believe Provident's instruction to continue making payments and its acceptance of those payments was a representation that some sort of post-bankruptcy agreement had been reached to cure or otherwise modify his arrearages. Rather, it demonstrated only that Provident acted as though his bankruptcy case was still open, little more. It is necessary to keep our eye on the ball; although Provident may have been negligent in failing to update the status of Brunson's account (and Brunson may have contract remedies), it did not negligently misrepresent its (erroneous) understanding of the status of the matter.[19]

---

[18] For instance, Brunson does not claim to have supplied Provident with the bankruptcy dismissal order in spite of its repeated assertions that the case was still in bankruptcy.

[19] Brunson relies on the numerous communications he and Blackburn had with Provident in late 2008. He claims "the sheer volume" of these communications create a material factual dispute as to whether Provident made negligent misrepresentations and whether he reasonably relied on them. (Appellant's Op. Br. at 37.) Blackburn testified at the preliminary injunction hearing, but, significantly, he never said Provident told him Brunson's arrears would be overlooked or placed on the rear of the loan. In fact, Brunson admits there was no explicit statement to that effect. Moreover, Blackburn's call log (provided by Brunson) shows Brunson and/or Blackburn spoke with Provident twenty times from November 4 through November 19, 2008. Most of these contacts were to establish authorization for a third party (Perfect Home Living) to negotiate on Brunson's behalf and to discuss the delivery of a loan modification package. Three calls, including the last, show Provident told Brunson his account is still in bankruptcy. Thus, far from showing Provident negligently misrepresented that Brunson's delinquency had been cured or placed on the end of the loan, the call log reiterates Provident was operating pursuant to its belief Brunson was still in bankruptcy.

As to believing his overpayments were curing his arrears, Brunson fails to explain how his belief could be reasonable. On its face it seems inexplicable that Provident would accept an overpayment of $46 per month to cure his $10,000+ default, especially when the proposed bankruptcy plan called for a monthly payment of $201.95 for five years to cure it.[20]

Grasping at the last remaining straw, Brunson claims omissions "may be actionable as a negligent misrepresentation where the defendant has a duty to disclose." *See Smith v. Frandsen*, 94 P.3d 919, 923 (Utah 2004); *see also Sugarhouse Fin. Co. v. Anderson*, 610 P.2d 1369, 1373 (Utah 1980) ("Misrepresentation may be made either by affirmative statement or by material omission, where there exists a duty to speak."). He claims "Provident had a duty to disclose to [him] that, notwithstanding its countless representations that he should just keep making payments of $1,148.22, it believed it could foreclose on [his] loan whenever it chose to do so." (Appellant's Op. Br. at 43.) Yet again, when Provident told Brunson to continue making his payments, it simultaneously told him its records showed he was still in bankruptcy, which Brunson knew was incorrect. Thus, any reliance by Brunson on any "omission" was unreasonable.[21]

---

[20] Brunson actually only "overpaid" for four months because seven of the eleven payments made in 2009 were applied to amounts owed in 2008, when the higher payment still applied.

[21] Brunson did not allege any contract claims in his original or amended complaints. Nevertheless, relying on Rule 15(b)(2) of the Federal Rules of Civil Procedure, he now claims several contract claims were implicitly litigated and resolved in

(Continued . . .)

B. *FCRA*

From February 2008 to January 2010, Provident continuously reported Brunson's account as delinquent to credit reporting agencies (CRAs). It stopped reporting the delinquency from February 2010 to April 2010 while it investigated and responded to the January 20 QWR but resumed its reporting in May 2010. Brunson claims Provident, as a "user of credit," violated FCRA when it failed to send him deficiency notices prior to reporting his delinquency to the CRAs. (Appellant's Op. Br. at 45.) He claims this negative reporting prevented him from securing alternative financing to prevent the foreclosure.

15 U.S.C. § 1681m applies to "users" of consumer credit reports. It requires "any person tak[ing] any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report" to provide, *inter alia*, "notice of the adverse action to the consumer." 15 U.S.C. § 1681m(a)(1). While Provident may have been a "user" of a consumer credit report when it decided to provide financing to

---

the district court. We disagree. Rule 15(b)(2) states: "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." "A party impliedly consents to the trial of an issue not contained within the pleadings either by introducing evidence on the new issue or by failing to object when the opposing party introduces such evidence." *Eller v. Trans Union, LLC*, 739 F.3d 467, 479 (10th Cir. 2013) (quotations omitted). "But implied consent cannot be based on the introduction of evidence that is relevant to an issue already in the case when there is no indication that the party presenting the evidence intended to raise a new issue." *Id.* at 481 (quotations omitted). While Provident argued in the district court that the loan terms precluded any claim by Brunson that an oral agreement had been reached modifying his arrearages, that argument was merely one of many Provident raised in defense to Brunson's negligent misrepresentation claim. There is no indication Provident intended to raise contract claims not pled by Brunson.

Brunson, his allegations relate to Provident's reporting of Brunson's account as delinquent to CRAs. These allegations refer to Provident's status as a "furnisher," not a "user", of information under FCRA. Thus, § 1681m does not apply.

Under 15 U.S.C. § 1681s-2, "furnishers" of information to CRAs are prohibited from, among other things, knowingly providing inaccurate information to a CRA. 15 U.S.C. § 1681s-2(a)(1). If such furnisher is a "financial institution that extends credit and regularly and in the ordinary course of business furnishes information to a [CRA]," it must provide written notice to its customer when it provides negative information about that customer to a CRA. 15 U.S.C. § 1681s-2(a)(7)(A)(i). Once it gives "such notice, the financial institution may submit additional negative information to a [CRA] . . . with respect to the same transaction, extension of credit, account, or customer without providing additional notice to the customer." 15 U.S.C. § 1681s-2(a)(7)(A)(ii). But, while FCRA allows federal agencies and state officials to enforce these obligations, it does not allow consumers, like Brunson, a private right of action to do so. 15 U.S.C. § 1681s-2(c), (d); *see also Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1147 (10th Cir. 2012); *Nelson v. Chase Manhattan Mortg. Corp.*, 282 F.3d 1057, 1059 (9th Cir. 2002). Thus, even assuming Provident failed to provide the required notice, Brunson is without recourse.[22]

_____

[22] FCRA does allow a consumer to enforce a furnisher's duty to provide accurate and complete information to CRAs through its dispute process. *Sanders*, 689 F.3d at 1147; *Nelson*, 282 F.3d at 1060. When a furnisher receives notice of a consumer dispute from a CRA, the furnisher "must perform the verification and correction duties described

(Continued . . .)

C. *RESPA*

RESPA "is a consumer protection statute enacted to regulate real estate settlement processes" including loan servicing. *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1145, 1148 (10th Cir. 2013). Among other things, it requires servicers of "federally related mortgage loan[s]" to timely respond to a borrower's QWR—first by acknowledging receipt of the QWR and then, after conducting an investigation, providing a written statement of the reasons it believes its accounting is correct and/or providing the information requested by the borrower. 12 U.S.C. § 2605(e)(1)(A),(2). At the time of the events in this case, the servicer had twenty days (excluding weekends and holidays) to acknowledge receipt of the QWR and sixty days (again excluding weekends and holidays) to investigate and provide a substantive response to the QWR and/or provide the requested information.[23] *Id.* If the servicer fails to comply with these statutory mandates, the borrower may recover actual damages resulting from the failure. 12 U.S.C. § 2605(f). The servicer's duty to respond is triggered by receipt of a QWR—a "written correspondence, other than notice on a payment coupon" that states the name and account number of the borrower as well as a statement of the reasons the borrower believes the

---

in 15 U.S.C. § 1681s-2(b)." *Sanders*, 689 F.3d at 1147. If it fails to do so, it is subject to suit by the consumer. *Id.*; *see also* 15 U.S.C. § 1681s-2(c) (limitation on private right of action does not apply to violation of duties listed in § 1681s-2(b), only to those duties listed in § 1681s-2(a) and (e)). Brunson does not claim to have filed a dispute with any CRA.

[23] In July 2010, the statute was amended to provide the servicer five days to acknowledge receipt of the QWR and thirty days to conduct an investigation and substantively respond and/or provide the information requested.

account is in error or a request for information. 12 U.S.C. § 2605(e)(1)(B); *see supra* n.11.

Brunson claims Provident violated RESPA by refusing to recognize his letters as valid QWRs under the statute. Because of this refusal, he maintains Provident failed to provide an accurate accounting of the amounts he owed.

We need not decide whether the letters authored by Brunson and his attorney constitute proper QWRs under the statute. Instead, we assume so. And Provident timely responded to them; Brunson does not argue otherwise.[24]

Brunson's real complaint boils down to his claim the information provided by Provident was not accurate. But RESPA does not require the servicer to provide information the borrower believes to be accurate. It requires the servicer to provide "a statement of the reasons *for which the servicer believes* the account of the borrower is correct *as determined by the servicer*" and the information requested by the borrower. 12 U.S.C. § 2605(e)(2)(B), (C) (emphasis added); *see also Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126, 1135 (11th Cir. 2014) (finding servicer complied with RESPA by providing borrower with reasons it believed account was correct even though borrower

---

[24] Brunson sent his QWR on December 29, 2009; his attorney sent another QWR on January 20, 2009. Provident claims it did not receive Brunson's QWR; Brunson does not dispute the claim. In any event, on January 28, 2010, within twenty business days of both QWRs, Provident sent a letter acknowledging receipt of a QWR. Then, on March 24, 2010, within sixty business days of both Brunson and his attorney's QWR, Provident provided a written explanation of why it believed its accounting was correct and enclosed the information requested.

was "confused and/or unsatisfied with [the] answer").  Provident did so.

**AFFIRMED.**

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge